IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 26, 2011

**STATE OF TENNESSEE v. RONALD EUGENE BREWER, JR.**

**Appeal from the Criminal Court for Hawkins County**
**No. 09CR0022    John F. Dugger, Jr., Judge**

---

**No. E2010-01147-CCA-R3-CD - Filed July 14, 2011**

---

Following a jury trial, the Defendant, Ronald Eugene Brewer, Jr., was convicted of first degree premeditated murder, first degree murder in the attempt to perpetrate a first degree murder, and criminal attempt to commit first degree murder. Following a sentencing hearing, the jury sentenced the Defendant to life imprisonment without the possibility of parole for each count of first degree murder. The trial court merged the two counts of first degree murder and imposed a concurrent twenty-five-year sentence for the third count. In this direct appeal, the Defendant raises the following issues for our review: (1) The State presented insufficient evidence to sustain a conviction for first degree murder; (2) The indictment alleging the intent to directly kill the victim was improperly before the jury; (3) The trial court erred when it refused a change of venue; (4) The trial court erred when it allowed the 911 tape to be admitted into evidence; (5) The trial court erred when it allowed the Defendant's signed statement, and a comment he made to a police officer while being transported, to be admitted into evidence; (6) The trial court erred when it allowed material related to gangs and gang activity to be admitted into evidence; (7) The trial court erred when it allowed purported expert testimony about gangs; (8) The trial court erred when it allowed testimony about a shell casing found in the Defendant's vehicle; (9) The trial court erred when it allowed the State to use and present two aggravating circumstances to the jury; and (10) The evidence was insufficient to support a sentence of life imprisonment without the possibility of parole. After our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, SP. J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS,. JJ., joined.

Greg W. Eichelman, Morristown, Tennessee, for the appellant, Ronald Eugene Brewer, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and John D. Godbee, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

Around 8:30 p.m. on December 9, 2008, Jackson Blue Sellers, the eighteen-year-old victim, was talking to friends in the parking lot of the Rogersville Wal-Mart when he was shot and killed by the nineteen-year-old Defendant. When the Defendant fired his rifle into the parking lot from an abandoned car wash perched upon an adjacent hill, the victim was not his intended target. The Defendant claimed that, when he fired the shot, he was trying to wound, but not kill, Josh Hinkle.

A Hawkins County grand jury returned an indictment charging the Defendant with one count of premeditated first degree murder, one count of first degree murder in the attempt to perpetrate the first degree murder of Josh Hinkle, and one count of criminal attempt to commit the first degree murder of Josh Hinkle. The Defendant's trial was conducted February 15-18, 2010.

The State presented the testimony of multiple witnesses who were in the Wal-Mart parking lot at the time the victim was shot. Jason Greene recalled that he and the victim were engaged in a conversation with some friends. Mr. Greene turned around toward his vehicle to get a cigarette and, at that time, he heard what he thought was a firecracker. When he came back to where the victim was standing, he saw the victim holding his throat. Mr. Greene stated that blood started to come out of the victim's mouth and that the victim then fell to the ground.

Meghan Brooks testified that, during the evening of December 9, 2008, she went to Wal-Mart with her friend Samantha Allen. By the time they arrived, some of their friends had already started gathering in the parking lot. She recalled that Jordan Hinkle, Josh Hinkle, Jason Morelock, Cody Harmon, Travis Goins, and the Defendant were all there. She said that Mr. Goins yelled for her to come over to where he and the Defendant were, however, she did not go over right away. The two men then drove over to Ms. Brooks and spoke to her. Before they pulled off, the Defendant told Ms. Brooks to "make sure none of these boys leave the parking lot" and "that he was serious." Ms. Brooks said that Mr. Goins and the Defendant were in a black Nissan Maxima and that she saw them leave the parking lot and go toward the highway.

Ms. Brooks saw the two men return, about ten to fifteen minutes later, and park in the parking lot "[f]or a little bit." Then, she witnessed them leave through Wal-Mart's back entrance. After she saw them leave, she said that she and the other people there "[j]ust sat around and socialized." About five minutes after the Defendant and Mr. Goins left the parking lot, however, Ms. Brooks heard a "pop." She testified that the victim began bleeding from his mouth and then fell to the ground.

Ms. Brooks said she believed that Josh Hinkle and Jordan Hinkle were affiliated with a gang called the Bloods, whose color was red, and that the Defendant and Mr. Goins were affiliated with a gang called the Crips, whose color was blue.

Samantha Allen testified that, on the night of the shooting, she saw the Defendant and Mr. Goins driving a black Nissan Maxima. She recalled that they were in the Wal-Mart parking lot for a little while, but then she saw them leave. Later, she heard what she thought was a firecracker and then she saw a black Maxima "flying out of the car wash." Ms. Allen also testified that Josh Hinkle and Jordan Hinkle were "wanna-be" gang members of the Bloods.

Wesley Lyles testified that he was friends with the victim and, on the night of December 9, 2008, the two men talked and drove around town together. They ended up at Wal-Mart, where they spoke to friends in the parking lot. Mr. Lyles described what happened next as follows:

> We were standing there and me and him were talking, and then he was going to get with Danielle, and I think they was going to go get a bite to eat or something like that, and he was going to come back and holler at me in a little bit, and we were standing there talking and we just—We heard something that sounded like a firecracker went off and then he just—He was—He staggered around there for a minute and he was rubbing his face and he kept asking what happened, and I didn't know what happened. He was just standing around and kept rubbing his face and he just collapsed right there.

Mr. Lyles said that, as his friend was lying on the ground, he put his hand behind the victim's head and blood drained all over it.

After Mr. Lyles heard the noise that sounded like a firecracker, he heard a vehicle "squealing out" and said, "It sounded like it was up on the hill, but I didn't—All I seen was the tail lights." He then clarified that by "up on the hill," he meant the car wash at an old gas station.

Charles Hoke said that, on the night of the shooting, he was talking to friends in the Wal-Mart parking lot. He recalled, "After I was there for a while, I looked up on the hill and I seen a car go by real slow and two guys looking down." He said that both of the people he saw in the car on the hill by the car wash were white with black hair. Then, Mr. Hoke heard a gunshot.

Michael Allmon testified that he owns a cleaning service and was cleaning the Walgreens pharmacy store right next to the Rogersville Wal-Mart. Sometime between 8:00 and 8:30 p.m., he was outside smoking a cigarette when he saw a dark-colored car, with its light off, go up on the hill and into the abandoned car wash. He recalled that he later heard a pop but did not know what the noise was.

Jordan Hinkle, who was sixteen years old at the time of the trial, testified that he and his brother Josh were affiliated with a gang called the Bloods. He said that, on the night of the shooting, he went to the Wal-Mart parking lot, where he saw the Defendant and Mr. Goins. He said that he saw them leave, then come back to the parking lot, and then leave again. After he saw them leave the second time, he heard what he thought was a firecracker. Then, he heard tires squeal at the top of the hill and saw a black Nissan drive off.

Josh Hinkle, who was twenty years old at the time of the trial, testified that he was affiliated with a gang called the Bloods on December 9, 2008. However, he said that, since then, he had "tried to put all that stuff behind [him]." He testified that he knew both the Defendant and Mr. Goins and that he and the Defendant "have had problems since back in middle school" because they did not see eye to eye. He acknowledged that, if they saw each other at the "right time," then they "might fight," but that they never pre-arranged times to fight. Josh Hinkle said there were also problems between him and Mr. Goins because they had been involved in a car accident in Mr. Goins' step-father's vehicle a few years prior and Josh Hinkle refused to pay to repair the damaged car.

On the night of the shooting, Josh Hinkle went to the Wal-Mart parking lot and "just hung out with a lot of people." He recalled that, at the time of the shooting, he was sitting on a corral where returned shopping carts are kept. He stated, "Everybody else was standing around me, and then we heard pop, a real loud pop." He said that he then saw the victim grab his neck and collapse.

Danielle Bailey testified that she knew the victim and his mother. She recalled that, when she went shopping at Wal-Mart on December 9, 2008, she saw the victim in the parking lot as she was leaving and pulled over to talk with him. She said that they talked for a little while and then they decided to go hang out together. Ms. Bailey testified, "I was sitting in my car and he was about maybe three foot [sic] away from the driver's fender and

I was, like, let's go, and he was telling everybody bye, and that's when it happened." She described that she heard a "pop" and then saw that the victim was bleeding.

Amy Snapp testified that she used to be a "queen" in a gang called the Black Gangster Disciple, which is a "cousin" to the Crips. Ms. Snapp said that she knew the Defendant and Mr. Goins were affiliated with the Crips and that she "took them under [her] wing." She was at Wal-Mart on the night of December 9, 2008, and was in the process of leaving the parking lot and going to get something to eat, when she "heard a pow, like a firecracker." She did not know that the victim had been shot, and she and her cousin continued to drive toward the restaurant. She then described, "As we was at the red light, I seen a black car jump over—It was coming from the car wash and the Exxon." She said that the black car was the same car in which she had seen the Defendant and Mr. Goins earlier that evening.

Through testimony of an employee who worked at a gas station near the crime scene, the State introduced surveillance pictures showing the Defendant and Mr. Goins at the gas station at 5:31 p.m. The pictures show that the men were in a black Nissan Maxima.

Dr. William McCormick performed an autopsy on the victim and testified that the victim "was shot one time at a distance with a bullet entering the junction in the back of the head and the upper neck, just to the left of midline. The bullet angled from above downward and ended up lodged on the inside of the large jaw, the mandible." Dr. McCormick also stated that, when the bullet traveled through the victim's neck, it caused bleeding. He said that he found that the victim both inhaled and swallowed blood and that the victim's death, caused by his aspiration of blood, "would have been rapid but not instantaneous."

Special Agent Scotty Ferguson from the Tennessee Bureau of Investigation testified that he reported to the crime scene the night of the shooting, but he arrived after the victim was taken to the hospital. Although he could not be sure where the victim was standing when he was shot, based on witness statements, he estimated that the victim was standing approximately ninety-two feet from the edge of the concrete at the old car wash. He also said that the victim was standing approximately twenty-two feet from where Josh Hinkle was sitting on the shopping cart corral.

Special Agent Ferguson recalled that the Defendant was arrested on December 13, 2008. After his arrest, the Defendant gave consent for the police to search the black Nissan Maxima, which was found at his father's girlfriend's residence. Special Agent Ferguson testified that a .22 caliber shell casing was found on the floorboard on the front passenger's side of the Nissan Maxima.

On December 13, 2008, the Defendant signed a rights waiver and gave a statement to Special Agent Ferguson. In pertinent part, the Defendant's statement provided as follows:

Josh Hinkle and Travis [Goins] used to be good friends. Josh wrecked Travis's car (it had been Travis's dad's car). Josh never paid Travis back for the car.

This has been going on since 2003. I was trying to get Josh for Travis. Josh always runs from Travis and me.

Josh has got some of his little buddies to talk trash and stuff about me and Travis. They do it on the phone and on My Space. Josh and his little boys think they are Bloods. Bloods are black.

. . . .

They send messages on My Space about beating me up. Josh calls on my cell phone and says he wants to fight but he never shows up.

I had went to Josh's house but learned he lives with his Grandmother. I learned it was his Grandmother's place and she is elderly so I didn't want to disrespect her.

Jordan Hinkle and some of his black buddies said on My Space that they were going to come and kick in my Grandmother's door. This was around February. . . .

I saw Jordan Tuesday afternoon at school. He was throwing up gang signs (at the buses). It was when they were getting out of school at about 3:00 p.m. I was driving the black Nissan Maxima. I got it since I was getting ready to have a kid. I got out and did it back to him. Travis and Adam (red hair) were with me and saw Jordan throwing the signs.

Me and Travis rode around some that day. We took showers (Dad's house). I live with my Granny. We went to Travis's girl's house (Jasmine) but she was sick. We rode around town and talked to some people. We went to Wal-Mart. We were sitting w[h]ere everyone was. Travis was talking to Jim Ward and I was talking to Shane Harmon/Harlan (just got out of Army). Jordan and Josh pulled up in their Brat. Jordan jumped out and started talking to all the Blood dudes. Jordan said I seen Eugene Brewer at school but then

-6-

he seen me sitting there so then he started whispering to his buddies. Jordan came over to the car and talked to Travis. Jordan said that he didn't have a problem with Travis but just with me. I told him that I never had a problem with him until he threatened to kick my Grandmother's door. He then left and went back to his buddies.

We then went to Big Lots to see if anyone was there. We then went to Jasmine's because Travis was worried someone else might be there. Then we came back to Wal-Mart. We went to same spot and I talked to Shane again. Everyone was just talking and staring and stuff. More of Josh and Jordan's friends (Bloods) started coming in and you know something was up. I can feel the animosity. I have seen Josh and Jordan with guns before. I did not see any guns that night but they have threatened to shoot me.

I then talked to Danny Bledsoe—him and Candy were getting ready to go into Wal-Mart. I told Danny that they were getting pretty deep and I thought something was going to happen. . . .

I thought something was going to happen. They kept getting deeper and deeper. I asked Danny if he would help and he said he would but he did not believe anything was going to happen.

Danny went on in the store.

Me and Travis just sat there and watch what was going on. . . . They were yelling at us but never came toward us. We went to Dad's to get the [.]22 rifle. The gun was in my bedroom. It was short and had a scope. It held 6 rounds. It was loaded. I worry about them kicking my doors in. Beck and Rhonda were there[.] I don't think they saw me get the gun. Travis went in to charge his phone. I don't know if Travis saw me or not. I put the gun beside the seat. The gun was between the driver's seat and console. Rhonda came out while I was sitting in the car. Rhonda said Brandon West was put in jail. She said that Travis was charging his phone and would be out in a minute.

We went back to Wal-Mart. I was driving. We parked in front of the gas part. We were parked about 15[1] minutes. We moved up some in the parking lot. We drove around toward Wal-Mart and then to another parking spot on the other side of them. I saw Brandon West drive around and go out at the red light. They (Hinkle's [sic] and Bloods) were hollering. There were more coming in. They were yelling at us and making hand gestures.

We sat there a little longer. I figured they would eventually come to the car. They were driving around our car some. We left the parking lot. We went up to the car wash. We sat there. We just were off 66.

I got into the passenger seat. Travis drove to where we could see the people. He pulled too close. I told him to pull back. Everyone knew we were up there. I put the gun out of the window and I asked Travis where Josh was sitting. He said he was sitting on the cart thing. Travis asked me not to kill him so I aimed low (chest area). I pulled the trigger. I assume Jackson walked in front of Josh. I don't know Jackson. We drove off. We went to Kingsport on the back roads. We went to some apartment parking lot.

Travis began getting scared. He was excited when I first shot. We had about hit a police car on 11W (it had its blue lights). After that Travis freaked out whenever a car passed. He said we can't go back to Rogersville, he would lose his job and not see his daughter. At the parking lot Travis was getting calls that people were threatening his family. He kept saying he was going to turn himself in.

I spent the night in the car. I have only slept one night since it happened.

I tried to call Kayla.

The car is at Rhonda's trailer in Bulls Gap. She does not know it is there. I threw the gun in a dumpster in Kingsport. I think it was Model City Apt. we were at. I put the gun in one of the large dumpsters that a truck picks up. The dumpster was right there at the apartments we were at. The dumpster was to the right.

---

[1] It is not clear whether the statement says ten or fifteen minutes. The written statement appears to say fifteen minutes but Special Agent Ferguson, who wrote out the statement that the Defendant signed, said ten minutes when he read the Defendant's statement during the trial.

The dude that died, I did not mean for him to die. I would tell him I was sorry. There is nothing I can say to [sic] dude, he is gone.

I kept the gun was [sic] in my room. Dad had the gun. Mom had took it but Mom brought it back.

I was just wanting to see Kayla. We were in Dad's van.

I gave this statement freely and voluntarily. No threats or promises have been made to me. I gave this statement because I wanted to tell the truth and give my side of the story.

When Special Agent Ferguson was asked about the Defendant's demeanor while he was giving the statement, he replied, "I wouldn't say he was overly upset and not real, real nervous. He was actually very matter of factly."

Assistant Chief James Hammonds, from the Rogersville Police Department, testified that, on December 15, 2008, after the Defendant's arraignment, he transported the Defendant from Rogersville to the Grainger County Jail. He stated that, during the trip, the Defendant said, "[T]his is just a bad dream and I am waiting to wake up[.] I've really messed up."

Shelley Betts, employed by the Tennessee Bureau of Investigation and assigned to the firearms identification unit, testified that she examined a fired cartridge case and described that "[i]t was a Remington manufactured brass cartridge case, and it was .22 long rifle caliber." Ms. Betts also examined the bullet that struck the victim and said that "it was consistent in all regards to Remington bullets."

Investigator James Quick, from the Knoxville Police Department Intelligence/Gang Unit, testified that he identifies gang members by utilizing a point system that "break[s] down gang identifiers as well as criminal activity." He explained that, if a person had ten points or more, it would verify that they were a gang member. Investigator Quick testified that he reviewed literature, pictures, and posters found in a search of the Defendant's bedroom and assigned twenty-three points to the Defendant.

The Defendant, twenty-one years old at the time of the trial, testified that he became fascinated with the Crips when he was ten or eleven years old and was a member of the gang. He described Josh and Jordan Hinkle as "wannabe Bloods." However, he explained that their different gang affiliations did not cause his dislike of the Hinkles. The Defendant said that "the feud started over the car of Travis's deceased father. Hinkle had wrecked it and said he would pay for it, the damage, and never did."

On the night of the shooting, the Defendant said that, when he was in the Wal-Mart parking lot, he felt "the tension was building up." He elaborated, "I figured something was going to happen because it was . . . the first time that me and Hinkle had actually been that close to one another without him running away." Therefore, he went to his father's house and got a .22 caliber rifle. The Defendant claimed that he got it because he knew the Hinkles "tend to carry guns and stuff."

The Defendant recalled that he and Mr. Goins returned to the parking lot and observed people "standing around there and talking and stuff and making hand gestures or whatever towards" their car. He explained that the hand gestures he saw were used to indicate "what are you looking at, or something like, do you have a problem?"

Then, the two men went up to the car wash. When asked why, the Defendant replied, "I wanted to observe the crowd of people, I guess at a better angle." The Defendant described what happened next as follows:

> [W]e pulled up on the backside of the car wash and we sat there for a minute. And I told Travis to get in the driver's seat, so I got out and walked around the car, and he walked around the front of the car and I walked around the back. And then when I got in the car I took the gun out and put it on my side, on the passenger side. And then when he got, you know, in the driver's seat he pulled through the back bay and went around to the front until we could see the parking lot. And he pulled up more towards the parking lot than I wanted him to so I asked him to pull back. And then he pulled more to the building, and I put the gun out the window. And I looked through the scope and it was dark so I couldn't see real well at the time. I mean, I could see where the light in the parking lot was on the people standing there. And I seen Hinkle sitting on the car—return cart rack, and I made sure, I asked Travis, I said, Is Hinkle setting on the cart rack? And he told that, yes, that's where he's sitting.
>
> And then, you know, I looked through the scope again or whatever, and Travis asked me not to kill no one. And I had no intentions of killing anyone, anyways. I aimed low like below the hip—between the hip and knee area because he was sitting on the cart rack. And I pulled the trigger.

The Defendant said that they then drove away. He claimed that he did not know if anyone had been struck by the bullet. However, when asked why he left, he replied, "I fired a shot into a—a public area."

The Defendant explained that the catalyst that brought about the shooting was a threat that the Hinkles had made to kick in his grandmother's door and shoot at her house. He testified, "I was just tired of the threats and, you know, I had started dwelling on the situation so I decided, you know, I figured I would scare the dude." Although the Defendant did not agree that he planned the shooting, he acknowledged that he "thought about it."

The Defendant maintained that, when he fired the rifle, he "aimed to wound and scare" Josh Hinkle. However, when asked whether he knew he shot somebody when he left the scene, he replied, "Well, yes. I aimed at the dude to wound and scare him. So I figured it would hit him. I figured somebody would have been shot."

Regarding the notation in his statement that he aimed for Josh Hinkle's chest area, the Defendant said that Special Agent Ferguson must have misunderstood him. He recalled his conversation with Special Agent Ferguson as follows: "[H]e said, What do you mean low? He said, [c]hest area? And I said, no, chest would be high."

Regarding his assumption that the victim must have walked in front of Josh Hinkle at the moment he fired the rifle, the Defendant explained, "It was the only thing I could figure out because at the time I didn't—nobody was in front of him. I mean, they [sic] might have been people off to the right of him or the left of him. There was nobody directly in front of him, though." The Defendant said that he did not know the victim and that, as far as he knew, the victim "had nothing to do with any gang activity."

The jury returned guilty verdicts for all three counts as charged and assessed a $25,000 fine for count three (criminal attempt to commit the first degree murder of Josh Hinkle). A sentencing hearing was conducted for the two counts of first degree murder and, on each count, the jury sentenced the Defendant to life imprisonment without the possibility of parole. The trial court merged the two counts of first degree murder and imposed a concurrent twenty-five-year sentence for count three. The Defendant now appeals.

**Analysis**

In this direct appeal, the Defendant raises the following issues for our review: (1) The State presented insufficient evidence to sustain a conviction for first degree murder; (2) The indictment alleging the intent to directly kill the victim was improperly before the jury; (3) The trial court erred when it refused a change of venue; (4) The trial court erred when it allowed the 911 tape to be admitted into evidence; (5) The trial court erred when it allowed the Defendant's signed statement, and a comment he made to a police officer while being transported, to be admitted into evidence; (6) The trial court erred when it allowed material related to gangs and gang activity to be admitted into evidence; (7) The trial court erred when

it allowed purported expert testimony about gangs; (8) The trial court erred when it allowed testimony about a shell casing found in the Defendant's vehicle; (9) The trial court erred when it allowed the State to use and present two aggravating circumstances to the jury; and (10) The evidence was insufficient to support a sentence of life imprisonment without the possibility of parole.

## I. Sufficiency of the Evidence for First Degree Murder

The Defendant was convicted of one count of premeditated first degree murder (count one) and one count of first degree murder during the attempt to perpetrate the first degree murder of Josh Hinkle (count two). In this appeal, the Defendant argues that the State failed to present sufficient evidence to convict him. It appears that the Defendant argues that the evidence was insufficient under either theory of first degree murder. Although the trial court merged the two convictions, we will address the sufficiency of the evidence for each count.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

**A. Count One—Premeditated First Degree Murder**

Tennessee Code Annotated section 39-13-202(a)(1) states that "[a] premeditated and intentional killing of another" is first degree murder. The statute further provides that "'premeditation' is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). However, this Court has noted that "[p]roof of premeditation is inherently circumstantial. The trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." State v. Gann, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007); see also Bass v. State, 231 S.W.2d 707, 711 (Tenn. 1950) ("Both premeditation and deliberation may be inferred from the circumstances of a homicide."). Specifically, the following factors have been used to support a finding of premeditation:

> the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness after a killing.

State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004).

In Millen v. State, 988 S.W.2d 164, 165 (Tenn. 1999), our supreme court examined a case in which a fourteen-year-old girl was struck and killed by a bullet fired by the defendant, who was a member of the "Bloods" gang. When the defendant fired the gun, his intended target was a member of the "Crips" gang. Id. The court looked at the common law doctrine of "transferred intent" but concluded that it was not necessary to apply it to a situation such as this, as the crime met the elements of our first degree murder statute. Id. at 167. The supreme court explained as follows:

> The legislature has broadly defined an "intentional" act as: "a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (1991) (emphasis added). A plain reading of this statute as applied to first degree murder indicates that a defendant's conscious objective need not be to kill a specific victim. Rather, the statute simply requires proof that the defendant's conscious objective was to kill a person, i.e., "cause the result." In short, if the evidence demonstrates that the defendant intended to "cause the result," the death of a person, and that he did so with premeditation and deliberation, then

-13-

the killing of another, even if not the intended victim (i.e., intended result), is first degree murder.

Id. at 168.

We conclude that the evidence presented was sufficient to convict the Defendant of first degree premeditated murder. The Defendant had been feuding with Josh Hinkle for several years, ever since he refused to pay to repair damage to Mr. Goins' father's car. He alleged that the Hinkles threatened to kick in his grandmother's door and that, the night of the shooting, he was dwelling on their threat. The Defendant and Mr. Goins went to the Wal-Mart parking lot, where they saw the Hinkles. They then drove to the Defendant's father's house, and the Defendant got a .22 caliber rifle. They returned to the Wal-Mart parking lot, but parked away from the group of people they were observing. Then, they exited the Wal-Mart parking lot and went to an abandoned car wash atop an adjacent hill. The Defendant explained that he wanted to observe the crowd "at a better angle." He got out of the driver's seat and got into the passenger's seat of the vehicle, asked Mr. Goins to verify Josh Hinkle's position amongst the group below and, upon his verification, he pulled the trigger. The Defendant fled the scene, threw the rifle in a dumpster at an apartment complex in Kingsport, and moved around from county to county until he was apprehended by police four days later. The evidence was sufficient for a rational trier of fact to conclude that the Defendant intended to cause the death of a person, Josh Hinkle, and that he did so with premeditation, but struck the victim, an innocent bystander, instead. The Defendant is not entitled to relief on this issue.

### B. Count Two—First Degree Murder Committed in the Attempt to Perpetrate a First Degree Murder

Tennessee Code Annotated section 39-13-202(a)(2), commonly referred to as the "felony murder" statute, provides that "[f]irst degree murder is . . . [a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder." In Millen, although our supreme found that the death of an unintended victim could be prosecuted under the theory of premeditated first degree murder, the court noted that "prosecuting these 'unintended victim' cases as felony murder would appear to be the most appropriate application of the statute." 988 S.W.2d at 167.

As discussed above, the evidence was sufficient to support a theory that, when he fired his .22 rifle into the Wal-Mart parking lot, the Defendant intended to kill Josh Hinkle but missed him and shot and killed the victim. Thus, we find that the evidence was sufficient for a rational trier of fact to convict the Defendant of first degree murder committed in the attempt to perpetrate the first degree murder of Josh Hinkle.

-14-

## II. Two Theories of First Degree Murder

The Defendant argues that "allowing the presentation of two different theories of first degree murder was both confusing and unnecessary." However, the Defendant's argument is misplaced, as he summarized the two theories as follows: "a deliberate attempt to murder Jackson B. Sellers as opposed to the death of Jackson Sellers pursuant to an attempt to kill another individual." As discussed above, the State was not required to prove that the Defendant intended to kill the victim to prevail on the premeditated first degree murder charge because it presented sufficient evidence for the jury to conclude that the Defendant intended to kill Josh Hinkle. See Millen, 988 S.W.2d at 168 ("[A] defendant's conscious objective need not be to kill a specific victim.").

Moreover, we conclude that both theories were properly before the jury. In Carter v. State, 958 S.W.2d 620, 624 (Tenn. 1997), our supreme court noted "that there is no constitutional or statutory prohibition against a jury rendering a general verdict of guilty of first degree murder where both premeditated and felony murder are charged and submitted to the jury." The high court has also said that trial courts "should instruct a jury to render a verdict as to each count of a multiple count indictment which requires specific jury findings on different theories of first-degree murder." State v. Howard, 30 S.W.3d 271, 274 n.4 (Tenn. 2000) (emphasis removed). However, "when only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing first degree murder will support only one judgment of conviction for first degree murder." State v. Cribbs, 967 S.W.2d 773, 788 (Tenn. 1998). In Howard, the supreme court instructed that, "[i]f the jury does return a verdict of guilt on more than one theory of first-degree murder, the court may merge the offenses and impose a single judgment of conviction." 30 S.W.3d at 274 n.4.

In the instant case, it was proper for the State to charge the Defendant with both premeditated first degree murder and first degree murder in the attempt to perpetrate the first degree murder of Josh Hinkle. Additionally, we conclude that the trial court did not err when it allowed both counts to be tried together and that the trial court properly merged the two first degree murder convictions. The Defendant is not entitled to relief on this issue.

## III. Change of Venue

The Defendant filed a motion to change venue due to the pretrial publicity about this shooting, as well as the fear that "[i]t would be difficult to find a jury which did not have residual concern for its own well[-]being," given that the crime occurred in the Wal-Mart parking lot just a couple of weeks before Christmas. In this appeal, the Defendant argues that the trial court erred when it denied his motion to change venue.

-15-

Rule 21(a) of the Tennessee Rules of Criminal Procedure provides that a trial court "should order a venue change when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." The decision of whether to grant a request for a change of venue is left to the sound discretion of the trial court and will not be reversed on appeal absent an affirmative and clear abuse of that discretion. See State v. Howell, 868 S.W.2d 238, 249 (Tenn. 1993). Furthermore, the Defendant must demonstrate that the jurors were biased or prejudiced against him before his convictions will be overturned on appeal. See State v. Melson, 638 S.W.2d 342, 361 (Tenn. 1982). "Prejudice will not be presumed on the mere showing that there was considerable pretrial publicity." State v. Kyger, 787 S.W.2d 13, 19 (Tenn. Crim. App. 1990).

In State v. Hoover, this Court listed seventeen factors for trial courts to consider when ruling on a motion to change venue. 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979). In the instant case, during the pretrial hearing regarding the Defendant's motion, the trial court specifically referenced Hoover and meticulously examined each of the seventeen factors before it concluded that "there has not been undue excitement against the [D]efendant from the county where the offense was committed" and denied the Defendant's motion. Upon our review of the record, we conclude that the trial court did not err or abuse its discretion when it denied the Defendant's motion for a change of venue. Moreover, the Defendant has failed to demonstrate that any of the jurors were biased or prejudiced against him. The Defendant is not entitled to relief on this issue.

## IV. Admission of the 911 Tape

The State played a recording, approximately three minutes long, of calls made to 911 regarding the shooting. The first caller was Jason Greene, one of the State's witnesses. Mr. Greene told the 911 operator that they needed help at Wal-Mart because someone had been shot in the neck. Sounds of people screaming and yelling can be heard in the background of the call. The 911 operator asked Mr. Greene if he knew who shot the victim, and Mr. Greene said that it was a black car. Later during the call, he explained that he did not see it, but "that's what people are saying around here."

The next call on the tape was very brief. The caller reported that he had just arrived at Wal-Mart and that someone had been shot. The dispatcher said that she would send someone out there, and the call ended. The last caller identified himself as "441" and, presumably, was a police officer or paramedic. He indicated that he could not find the gunshot victim but then, seconds later, he said, "Never mind, I found them."

The Defendant filed a pretrial motion to exclude the 911 tape. During a pretrial hearing about the issue, the State argued that the tape "sets the scene." The trial court found that it would be admissible and stated, "There were a lot of excited utterances in there, basically, occurring at the scene. Everybody is under stress of the situation and what they're saying. I think it would come in. Most 911 tapes do come in."

The Defendant asserts that the trial court erred when it allowed the 911 tape to be admitted into evidence. Specifically, the Defendant argues that the 911 tape was irrelevant and that it contained hearsay. In response, the State contends, "The tape was relevant to establish what occurred at the scene immediately after the shooting and was relevant to helping the jury to understand what was transpiring at the time." Additionally, the State argues that the 911 tape "was also relevant to show that there were several people present when the defendant fired a gun into the crowd, thus placing several other people in danger of being shot or killed."

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided . . . . Evidence which is not relevant is not admissible." However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

In the instant case, we cannot conclude that the trial court abused its discretion when allowing the State to present the 911 tape. The Defendant only broadly argues that the tape contains hearsay but does not specify which parts of the tape he objects to. In our view, the statements on the tape are excited utterances and are not excluded by the hearsay rule. See Tenn. R. Evid. 803(2) ("A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."). Regarding the Defendant's argument that the recording was irrelevant, we agree with the State that the tape was relevant, as it went to the facts that the victim was shot in the neck and that there were multiple people in the vicinity at the time of the shooting. In our view, the trial court did not abuse its discretion by allowing the 911 recording into evidence. The Defendant is not entitled to relief on this issue.

## V. Admission of the Defendant's Statements

The Defendant filed a motion to suppress a written statement he signed after being interviewed by Special Agent Ferguson on December 13, 2008, as well as an oral statement he made in the car to Assistant Chief Hammonds on December 15, 2008. The trial court held a suppression hearing on January 15, 2010.

Special Agent Ferguson testified that the Defendant was arrested on the evening of December 13, 2008, and that he took a written statement from the Defendant the same night. Special Agent Ferguson said that he advised the Defendant of his constitutional rights before taking the statement and that the Defendant signed a written waiver of those rights at 6:40 p.m. Special Agent Ferguson recalled that the Defendant "seemed to be fine" and that he did not seem intoxicated. He also stated that the Defendant "communicated very well" and he described the Defendant's demeanor as "just very matter of fact." Special Agent Ferguson testified that he reduced the Defendant's comments to writing and that Investigator Teddy Collingsworth from the district attorney's office reviewed the statement with the Defendant. Special Agent Ferguson recalled that the Defendant signed the statement at 8:20 p.m.

Officer Chris Pinkston, from the Rogersville City Police Department, testified that he saw the Defendant at the police department on the morning of December 15, 2008. The Defendant had been transported from the Grainger County Jail to the Rogersville police station, from which he was going to be taken to Kingsport to help look for his gun. Officer Pinkston recalled that, while the Defendant was at the police station, the Defendant was advised of, and waived, his constitutional rights. Officer Pinkston signed the Defendant's admonition and waiver of rights form as a witness.

Assistant Chief James Hammonds of the Rogersville City Police Department testified that, on December 15, 2008, he transported the Defendant from the Grainger County Jail to the Rogersville police station, from the Rogersville police station to Kingsport, from Kingsport to Hawkins County General Sessions Court, and then back to the Grainger County Jail. Assistant Chief Hammonds recalled that, during the trip from general sessions court to the Grainger County Jail, the Defendant said, "This is just a bad dream and I'm waiting to wake up. I've really messed up."

The Defendant testified that he went to school until the tenth grade but that he only had fourth-grade reading and writing levels. With regards to the December 13, 2008 waiver, he said that he signed the waiver after the six-page statement was made. When asked if he knew he had a right to an attorney, the Defendant replied, "Well, I mean, I know I have a right to an attorney. I wasn't arrested." He also acknowledged that he did not ask for an attorney.

Regarding his mental state at the time he made the statement, the Defendant testified, "I had been smoking meth for three to four days since the shooting had happened." However, he testified that those things did not affect his statement and further explained, "I was in a hurry to get out of the room with the police." The Defendant acknowledged that Investigator Collingsworth read his statement to him and that he initialed it and signed it.

The Defendant remembered signing a second waiver at the Rogersville police station before he was taken to Kingsport. He testified that he was not questioned by the police officer driving him either on the way to Kingsport or on the way back to the jail.

On cross-examination, the Defendant testified that he understood he was arrested for murder when he arrived at the police station and that he was willing to tell his side of the story to the police officers. The Defendant said that the police did not threaten him or promise him anything. Regarding the comment he made in the car to Assistant Chief Hammonds, the Defendant recalled, "I didn't say I really messed up. I just said I wished I would wake up. It all felt like a bad dream."

The trial court found that the Defendant's December 13, 2008 statement occurred when he was in custody and that "Miranda had been given, and it was given properly." The trial court denied the Defendant's motion to suppress, noting that the statement "was freely and voluntarily and understandably given."

The trial court also denied the Defendant's motion to suppress the Defendant's December 15, 2008 comment to Assistant Chief Hammonds, explaining as follows:

> He was not being interrogated at the time. He was on his way back to the Grainger County [J]ail, and he had been read his Miranda warnings but he just volunteered that particular statement. So the [c]ourt finds that the statement should be admissible, that they were voluntarily, knowingly, and understandably made, and his rights were voluntarily, understandably and knowingly waived to give a statement.

In this appeal, the Defendant contends that the trial court erred when it admitted these two statements. The State argues that the trial court properly admitted the statements because both statements were given after the Defendant waived his Miranda rights.

Regarding the standard of review for a trial court's ruling on a motion to suppress, our supreme court has stated as follows:

-19-

Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, this Court reviews de novo a trial court's conclusions of law and application of law to the facts. See State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000).

The right against self-incrimination is protected both by the Fifth Amendment to the United States Constitution, and the Tennessee Constitution article I, section 9. To help ensure the protections of the Fifth Amendment in the criminal process, the United States Supreme Court held in Miranda v. Arizona that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. A defendant can waive his Miranda rights, "provided the waiver is made voluntarily, knowingly, and intelligently." Id. "In determining whether a confession has been made knowingly and voluntarily, courts must look to the totality of the circumstances." State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992).

The Defendant was arrested on December 13, 2008, and questioned later that day. Special Agent Ferguson testified that he advised the Defendant of his rights and that he witnessed the Defendant waive his rights at 6:40 p.m. He interviewed the Defendant and reduced his version of events to writing. Special Agent Ferguson said that Investigator Collingsworth reviewed the statement with the Defendant and that the Defendant signed the statement at 8:20 p.m. Moreover, Special Agent Ferguson recalled that the Defendant "seemed to be fine" and that he "communicated very well." Although the Defendant claimed that he did not sign the rights waiver form until after he gave his statement, the trial court found that the Defendant's statement was given after he was advised of, and waived, his rights. We conclude that the evidence does not preponderate against the trial court's finding that the Defendant voluntarily, knowingly, and intelligently waived his Miranda rights.

We also conclude that the trial court did not err when it denied the Defendant's motion to suppress the oral statement he made in the car to Assistant Chief Hammonds. Officer Pinkston testified that, on December 15, 2008, the Defendant was advised of, and waived, his Miranda rights. The Defendant also acknowledged signing a waiver form before he was transported to Kingsport and that he made the comment in the car to Assistant Chief Hammonds spontaneously, without any questioning from the officer. Although the Defendant contends that he did not say "I really messed up," the trial court noted that the officer made notes about the Defendant's comment and that it was a "credibility issue." We conclude that the evidence does not preponderate against the trial court's findings that the Defendant's comment to Assistant Chief Hammonds was made after he had been advised of, and waived, his Miranda rights.

Finally, the Defendant argues that the statement he allegedly made to Assistant Chief Hammonds is not relevant and should have been excluded. Assistant Chief Hammonds testified that the Defendant said, "This is just a bad dream and I'm waiting to wake up. I've really messed up." We conclude that the trial court did not abuse its discretion in allowing the statement to be admitted into evidence. The Defendant is not entitled to relief on this issue.

## VI. Gang-Related Material

During the course of the police investigation, a search was conducted at the Defendant's house and alleged gang-related literature, pictures, and posters were obtained. A search warrant for the Defendant's My Space page was also obtained, which revealed more photographs. The Defendant objected to the introduction of any gang-related material. The trial court overruled the Defendant's objection and, in this appeal, the Defendant asserts that the trial court erred when it allowed the admission of material related to gangs and gang activity.

In State v. Crayton, this Court stated that "evidence concerning gang affiliation is character evidence subject to Rule 404(b)." No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App., Jackson, June 27, 2001). Rule 404(b) of the Tennessee Rules of Evidence provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Our supreme court has said that "[t]he other purposes may include evidence of 'the motive of the defendant, intent of the defendant, the identity of the defendant, the absence of mistake or accident if that is a defense, and rarely, the existence of a larger continuing plan, scheme, or conspiracy of which the crime on trial is a part.'" State v. Toliver, 117 S.W.3d 216, 230 (Tenn. 2003) (quoting State v. Gilliland, 22 S.W.3d 266, 271 n.6 (Tenn. 2000)).

Tennessee Rule of Evidence 404(b) states that, in order for evidence of other crimes, wrongs, or acts to be admissible for "other purposes," the following conditions must be satisfied:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

When reviewing a trial court's decision on evidentiary matters under Rule 404(b), this Court employs an abuse of discretion standard. See State v. Gilley, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008).

During a pretrial hearing, the State argued that the gang-related materials were relevant to show the Defendant's motive for the shooting. The trial court reviewed the material to which the Defendant objected and concluded, "[T]his gang stuff is relevant." The trial court later elaborated, "[T]he material issue is motive. It is argued that—and even in the [D]efendant's statement that there was going to be trouble with the Bloods and the intended victim in this case was considered a Blood and the [D]efendant holds himself out to be a Crip." The trial court also noted that the pictures the State wanted to introduce included the Defendant making gang signs. The trial court found that, of the twenty-three pictures at issue, seven should be excluded because any probative value was outweighed by the danger of unfair prejudice. Regarding the remaining sixteen photographs, the trial court stated that they "offer[ed] clear and convincing evidence of motive," and it ruled that the photos were admissible.

We conclude that the trial court did not abuse its discretion when it allowed evidence of gangs and the Defendant's gang-related activities to be introduced into evidence. In the Defendant's statement regarding the shooting, he made many references to gang activity. He said that "Josh and his little boys think they are Bloods," that Jordan Hinkle was "throwing up gang signs" at the school on the day of the shooting, that Josh Hinkle and Jordan Hinkle

were talking "to all the Blood dudes" in the Wal-Mart parking lot, that more of the Hinkles' friends arrived at Wal-Mart, that he could "feel the animosity," that he "thought something was going to happen," and that, when they returned to Wal-Mart after getting the rifle, the Hinkles' and the Bloods were hollering and making hand gestures at he and Mr. Goins. The trial court did not abuse its discretion in allowing the evidence of gang activity because the State's theory was that the rival gang affiliations of the Defendant and Josh Hinkle provided the motive for the shooting. Moreover, we agree with the trial court that the probative value of the photographs allowed outweighed the danger of unfair prejudice. The Defendant is not entitled to relief on this issue.

## VII. Gang Expert

The Defendant argues that the trial court erred when it classified Investigator Quick as an expert and allowed him to provide testimony about gangs. The State asserts that the trial court properly allowed Investigator Quick's testimony because it was relevant to show the Defendant's motive for the shooting.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. Rule 702 states, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703 further provides as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

This Court has stated that "[t]he allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." State v. Davis, 872 S.W.2d 950, 954

(Tenn. Crim. App. 1993). We will not reverse the trial court's decision "absent a clear showing of abuse of discretion." Id.; see State v. Reid, 91 S.W.3d 247, 302 (Tenn. 2002). This Court will not find an abuse of discretion unless "it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

Investigator Quick testified that, since 1996, he has been a member of the gang task force of the Knoxville Police Department. He also said that he was one of the founding members and was the current regional Vice President of the Tennessee Gang Investigative Association. Investigator Quick received training from the Federal Bureau of Investigation, the Tennessee Bureau of Investigation, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and the Regional Organized Crime Information Center. He said that he had been trained in how to identify gang members by looking at the colors they wear, hand signs, tattoos, different wording they use, and alphabets. Investigator Quick stated that he was familiar with Tennessee law regarding gangs and that he had testified as a gang expert in both state and federal courts.

In his brief, the Defendant appears to argue that, because Investigator Quick's "shorter and concise" definition of a gang[2] differs from the definition in Tennessee Code Annotated section 40-35-121, it proves that he was not properly qualified to testify as an expert in gangs. However, we note that Investigator Quick testified that he was familiar with Tennessee's gang law, described it as "pretty lengthy," and asked if he could read the definition they use in Knoxville. The Defendant was free to cross-examine Investigator Quick about his knowledge of the statutory definition of a gang and call the jury's attention to any discrepancies between that definition and the one Investigator Quick recited.

As we discussed above, we agree with the trial court that the Defendant's gang activity was relevant to show his motive for the shooting. As for Investigator Quick's qualifications, we note that our supreme court has stated that a "witness may acquire the necessary expertise through formal education or life experiences." Reid, 91 S.W.3d at 302. Investigator Quick testified that he had been on a gang task force since 1996, had attended

---

[2] When asked about the definition of a gang, Investigator Quick stated as follows:

There's different definitions around. Of course, the [S]tate's definition is pretty lengthy. The one we use in Knoxville is a little shorter and concise . . . .

It's a group of three of more individuals who meet all the following criteria: They have a name or identifiable leadership. They maintain a geographic, economic or criminal enterprise turf. They associate on [sic] continuous or regular basis, and they engage in delinquent or criminal activity.

numerous training programs, and had been qualified as a gang expert in both state and federal courts. We conclude that the trial court did not abuse its discretion when it classified Investigator Quick as a gang expert. See State v. Justin Mathis, No. W2005-02903-CCA-R3-CD, 2007 WL 2120190, at *9 (Tenn. Crim. App., Jackson, July 20, 2007) (finding that the trial court did not err when it classified a police officer as an expert in gangs). The Defendant is not entitled to relief on this issue.

## VIII. Shell Casing

The Defendant argues that the trial court erred when it permitted Ms. Betts to testify about a shell casing found in the Defendant's vehicle. Specifically, he argues that her testimony was "neither relevant nor material and should not have been admitted." We disagree.

Special Agent Ferguson testified that the Defendant informed him where he parked the black Nissan Maxima and that, during a search of the vehicle, a .22 caliber shell casing was found on the floorboard on the front passenger's side of the car. Special Agent Ferguson testified that he collected the evidence and sent it to Ms. Betts at the Tennessee Bureau of Investigation crime laboratory. Ms. Betts testified that she examined the fired cartridge case and described that "[i]t was a Remington manufactured brass cartridge case, and it was .22 long rifle caliber." Ms. Betts also examined the bullet that struck the victim, which was recovered during his autopsy, and said that "it was consistent in all regards to Remington bullets." Thus, we conclude that Ms. Betts' testimony was relevant and that the trial court did not abuse its discretion when it admitted her testimony. The Defendant is not entitled to relief on this issue.

## IX. Aggravating Circumstances

After the jury convicted the Defendant of first degree premeditated murder and first degree murder in the attempt to perpetrate a first degree murder, a sentencing hearing was conducted. The State presented two aggravating circumstances to the jury: (3) The defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during the act of murder; and (7) The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit any first degree murder. See Tenn. Code Ann. § 39-13-204(i)(3), (7). The jury found that both aggravating circumstances applied and sentenced the Defendant to life imprisonment without the possibility of parole.

The Defendant contends that the trial court erred when it allowed the State to use and present two aggravating circumstances to the jury. Specifically, he argues that presenting

aggravating factor (7) was improper and contends, "This approach is tantamount to establishing that a first degree murder which is based upon the concept of felony murder, when that murder involves an attempt at first degree murder, will automatically be subject to the possibility of life without parole." The Defendant acknowledges that, in the trial court, he "relied upon the judicial philosophy set forth" in State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992). It appears the Defendant acknowledges that Middlebrooks is no longer the controlling law regarding this issue, but he implores this Court to adopt its rationale nonetheless. We decline to do so.

On multiple occasions, our supreme court has addressed the same argument that the Defendant now presents to this Court. In State v. Banks, 271 S.W.3d 90, 152 (Tenn. 2008), our high court explained as follows:

> In 1992, this [c]ourt held that Tennessee's broad definition of felony murder and the duplicative language of the felony murder aggravating circumstance required it to hold that Tennessee's first degree murder statute, as it existed at that time, did not sufficiently narrow the class of persons eligible for the death penalty to comply with the Eighth Amendment to the United States Constitution. State v. Middlebrooks, 840 S.W.2d at 346. The Tennessee General Assembly responded to this decision in 1995 by amending the aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(7) to require that the murder "was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit" one of the enumerated felonies.[3] This amendment narrowed the class of offenders to whom the death penalty could be applied sufficiently so as to leave no State v. Middlebrooks problem even in cases where Tenn. Code Ann. § 39-13-204(i)(7) was the only aggravating circumstance established and the conviction was for felony murder. State v. Reid, 91 S.W.3d at 306 n.13 (appendix).

(footnote in original); see also Reid, 91 S.W.3d at 306 (rejecting the defendant's argument that it was improper for the State to present aggravating circumstance (7) to the jury when the defendant had been convicted of both premeditated murder and felony murder); State v. Stout, 46 S.W.3d 689, 705-06 (Tenn. 2001) ("Unlike the statutes analyzed in Middlebrooks, the present versions of felony murder and the felony murder aggravating circumstance do not duplicate the elements of one another. The aggravating circumstance applies only where the jury finds that a defendant acted *knowingly* and had a *substantial role* in the offense. The additional elements were not in the prior version of the felony murder aggravating

---

[3] See Act of May 22, 1995, ch. 377, 1995 Tenn. Pub. Acts 587.

circumstance."). Thus, in accordance with the above decisions from our supreme court, we conclude that it was proper for the State to present aggravating circumstance (7) to the jury during the sentencing phase of the trial. The Defendant is not entitled to relief on this issue.

## X. Sufficiency of the Evidence to Support Life Imprisonment Without the Possibility of Parole

During the sentencing hearing, the Defendant presented testimony about the kind of home in which he grew up. Lisa Brewer, the Defendant's mother, testified that, when the Defendant was growing up, her household "was not a good place to be" because of "drugs, alcohol, [and] physical abuse." She acknowledged that she did not care about his education like she should have because she was "a drug addict and a drunk." Ms. Brewer said that the State took her son away from her when he was fourteen years old and placed him in various group homes.

Janie Helton testified that she had known the Defendant since he was born. She recalled that the Defendant started smoking cigarettes when he was five or six years old and that, at his home, "drugs were done openly and freely." However, Ms. Helton said, "I have seen a side of Eugene that most people never get to see, and he has a warm heart and an open heart and he can be a loving person."

The Defendant testified that he went to school until the tenth grade, but that he had obtained a special education diploma when he was in a juvenile detention facility. When the Defendant was asked about his feelings about gangs, he replied, "They are really very ignorant." The Defendant read aloud a letter that he had written to the victim. In the letter, he stated, in part, "I am sorry Jackson Blue Sellers. And I can't say much more than that. I did not write this for anyone to feel sorry for me. I wrote this because I am sorry for what has happened to Jackson Blue Sellers."

In addition to the two aggravating circumstances that the State presented, the jury was asked to consider three mitigating factors: (2) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance; (7) The youth or advanced age of the defendant at the time of the crime; and (9) Any other mitigating factor that is raised by the evidence produced by either the prosecution or defense, at either the guilt or sentencing hearing. See Tenn. Code Ann. § 39-13-204(j)(2), (7), (9). The Defendant asserts that the evidence was insufficient to support a sentence of life imprisonment without the possibility of parole because the aggravating circumstances did not outweigh the mitigating circumstances.

However, the Defendant is mistaken in his assertion that the aggravating circumstances need to outweigh the mitigating circumstances. Tennessee Code Annotated section 39-13-204(i) states that no "sentence of imprisonment for life without possibility of parole shall be imposed, except under a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances." See also State v. Butler, 980 S.W.2d 359, 362-63 (Tenn. 1998); cf. Tenn. Code Ann. § 39-13-204(g)(1) (requiring that, in order to sentence a defendant to death, the jury must find at least one aggravating circumstance and that the "circumstance or circumstances have been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt"). Regarding the imposition of a sentence of life imprisonment or life imprisonment without the possibility of parole, our statute further provides that

> [t]he trial judge shall instruct the jury that, in choosing between the sentences of imprisonment for life without possibility of parole and imprisonment for life, the jury shall weigh and consider the statutory aggravating circumstance or circumstances proven by the state beyond a reasonable doubt and any mitigating circumstance or circumstances.

Tenn. Code Ann. § 39-13-204(f)(2). "In determining whether the evidence supports the application of the aggravating circumstances, the proper standard to consider is whether, after reviewing the evidence in a light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstances beyond a reasonable doubt." State v. Stevens, 78 S.W.3d 817, 841 (Tenn. 2002).

We conclude that a rational trier of fact could have found the existence of both aggravating circumstances that the State argued. Ample evidence was presented during the trial that there was a crowd of people in the Wal-Mart parking in the same vicinity as the victim when the Defendant aimed his rifle at Josh Hinkle and fired it. The Defendant even acknowledged that he had fired his gun into a crowd of people. Additionally, both Ms. Bailey and Mr. Lyles testified that they were talking to the victim in the parking lot immediately before he was shot. Regarding aggravating circumstance (7), as we have discussed above, the State presented sufficient evidence that the Defendant intended to kill Josh Hinkle but missed him and hit the victim instead. The Defendant is not entitled to relief on this issue.

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
DAVID H. WELLES, SPECIAL JUDGE